## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| NARAYANA M. PAI, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CIV-05-1093-HE |
| | ) | |
| R. JAMES NICHOLSON, Secretary, | ) | |
| U.S. Department of Veteran Affairs, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

### ORDER

Plaintiff Narayana Pai, M.D. brings this action against defendant Secretary of the United States Department of Veterans Affairs in his official capacity, asserting discriminatory discharge, retaliation, and hostile work environment claims, pursuant to Title VII of the Civil Rights Act of 1964.[1]  Plaintiff alleges that his employer, a VA hospital, discriminated against him based on his race and national origin and his Equal Employment Opportunity Commission ("EEOC") activity.  Defendant has moved for summary judgment on plaintiff's claims.

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and…the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  The evidence and any reasonable inferences that might be drawn from it are viewed in the light most favorable to the nonmoving party.  <u>Davidson v. America</u>

---

[1] *Plaintiff also asserted claims against two of defendant's employees in their individual capacities.  The court previously dismissed these claims.*

Online, Inc., 337 F.3d 1179, 1182 (10th Cir. 2003). Having applied the Rule 56 standard to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law," Jeffries v. Kansas, 147 F.3d 1220, 1228 (10th Cir. 1998) (internal quotation and citation omitted), the court concludes the defendant's motion should be granted.

## BACKGROUND

Plaintiff, whose race is Asian and national origin is East Indian, worked as a staff psychiatrist at a VA hospital. He was initially employed part-time, was then converted to full-time employment, and in November of 2003, at his request, was placed back into part-time employment. Beginning in April of 2003, Dr. Barbara Masters became plaintiff's first-line supervisor in the ambulatory mental health unit. Dr. Masters told plaintiff that if he could work the part-time hours that the hospital needed him, he would be able to use the same office each day but, if not, he would have to rotate offices when the new full-time psychiatrist began. Plaintiff chose to work different part-time hours, but he nonetheless objected, at some point,[2] to rotating offices. On February 11, 2004, Dr. Masters issued a memorandum to the staff stating that two new physicians would be joining the staff and that she needed to shift office space. Dr. Masters assigned the full-time psychiatrists to permanent offices and assigned the part-time psychiatrists, which included plaintiff, Dr.

---

[2]*The evidence submitted by plaintiff indicates that he initially raised no objection with Dr. Masters as to the office arrangement, but later objected. See plaintiff's response, Exhibit 9, email from plaintiff dated February 27, 2004.*

Benjamin, Dr. Vad, and Dr. Sebastian, to share offices. On February 24, 2004, Dr. Masters revised the allocation of office space so that plaintiff could use the same office everyday with a half-hour overlap one day a week with Dr. Benjamin.

On March 4, 2004, Dr. Masters gave plaintiff a copy of a revised office assignment for the part-time physicians. Upon receiving the office assignment memorandum, plaintiff informed Dr. Masters, Dr. Robert Nisbet, chief of staff for the mental health unit, and Twila Williford, the administrative director, that he was taking sick leave because he could not provide adequate care to his patients due to harassment by Dr. Masters and the working conditions he was subjected to. Plaintiff had not previously scheduled leave and he was told he could not leave because he needed to attend to his patients. According to two other employees, before plaintiff left, one of his patients approached him and requested a prescription refill. The employees claim plaintiff did not attend to the patient's needs. On March 8, 2004, Dr. Donald McCaffree, chief of staff for the hospital, advised plaintiff by memorandum that his employment was being terminated. The memorandum recounted the March 4, 2004 events, including the allegation that plaintiff ignored the patient who approached him. The memorandum stated that plaintiff's "deliberate deprivation of care for [his] patients and callous attitude toward patient care are a violation of Center Memorandum 11-5, <u>Abuse of Patients</u>, as well as 5 CFR 732.203 which states that employees should not engage in conduct prejudicial to the government."

## **DISCUSSION**

**I.      Discriminatory Discharge**

The <u>McDonnell Douglas</u>[3] analytical framework guides the court's review of plaintiff's race and national origin discriminatory discharge claim. <u>Antonio v. Sygma Network, Inc.</u>, 458 F.3d 1177, 1181 (10th Cir. 2006). Plaintiff must first establish a prima facie case of prohibited employment action. <u>Green v. New Mexico</u>, 420 F.3d 1189, 1192 (10th Cir.2005). If he makes a prima facie showing, the burden shifts to defendant to state a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* "If the employer meets this burden, then summary judgment is warranted unless the employee can show there is a genuine issue of material fact as to whether the proffered reasons are pretextual." *Id.* (internal quotations omitted).

To establish a prima facie case of wrongful discharge, plaintiff must ordinarily present evidence tending to show: (1) that plaintiff belongs to a protected class, (2) that plaintiff was qualified for the position or benefit at issue, (3) the plaintiff suffered an adverse employment action, and (4) that plaintiff was treated less favorably than others similarly situated. <u>Argo v. Blue Cross and Blue Shield of Kansas, Inc.</u>, 452 F.3d 1193 (10th Cir. 2006). Here, plaintiff has presented evidence sufficient to satisfy the first three elements. Elements one and three are undisputed. As to element two, plaintiff has presented at least some evidence that he was qualified for his position and/or satisfactorily performing his job. It is far less clear that he has made the necessary showing as to the fourth element. He suggests he was treated

---

[3]<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

differently from others similarly situated with respect to rotating offices, that he was assigned or worked a heavier workload than other part-time psychiatrists, and that others accused of patient abuse were not terminated while he was. For the reasons discussed more fully hereafter in the context of evaluating the issue of pretext, it is doubtful that plaintiff has made the requisite showing. However, even assuming the establishment of a prima facie case, defendant has articulated a legitimate, nondiscriminatory reason for plaintiff's discharge, which shifts the burden to plaintiff to show the existence of a factual dispute as to pretext. The ultimate resolution of the matters in issue is more readily effected in that context.

Here, the legitimate, nondiscriminatory reason given for terminating plaintiff's employment was that his conduct on March 4, 2004, constituted a violation of Center Memorandum 11-5, in that his conduct was deemed to be abusive to patients, and of 5 CFR § 732.203, which prohibits conduct prejudicial to the government. Center Memorandum 11-5 states in pertinent part:

> It is the policy of this medical center that no patient is to be mistreated or abused in any way physically or verbally,...regardless of the nature of their position or condition of their appointment. Inquiry or investigation will be conducted in all instances of alleged abuse or mistreatment. All allegations, observations or suspected cases of abuse, neglect or expoitation (sic) that occur in the organization will be investigated.

*See* plaintiff's response, Exhibit 17. The policy defines "abuse" as "physical abuse, neglect, intimidation, cruel punishment, financial, abandonment, isolation or other treatment with resulting physical harm, pain, mental suffering, or <u>the deprivation by a care custodian of</u>

5

goods or services which are necessary to avoid physical harm or mental suffering." *Id.* (emphasis added). Further, the policy provides "[t]he administrative penalty required when abuse of patient has occurred is removal. Lesser penalty (suspension, demotion, reprimand) may be imposed only when the abuse is of a minor nature or there are mitigating circumstances."[4] *Id.*

Plaintiff contends that defendant's articulated reasons are pretextual.[5] Pretext can be shown by "evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Antonio, 458 F.3d at 1183. When assessing a contention of pretext, the court "look[s] at the facts as they appear to the person making the decision to terminate, not the aggrieved employee." Green, 420 F.3d at 1191, n. 2.

**A.    Contrary to Written Policies**

Plaintiff asserts that defendant acted contrary to its written policies when it terminated him. He argues that defendant did not investigate the allegations against him as required by Center Memorandum 11-5, but the undisputed evidence shows otherwise. Plaintiff admits

---

[4]*Plaintiff argues that he should have been given a lesser penalty. The court notes that the policy states that removal is the standard penalty for patient abuse.*

[5]*Plaintiff states that he is able to rebut that the nondiscriminatory reason for his discharge was based on poor job performance. Because defendant has not relied on plaintiff's job performance as the reason for his termination, the court need not address plaintiff's assertions as to his job performance.*

6

that Dr. Masters spoke with those who claimed to have witnessed plaintiff's patient abuse.[6] Plaintiff argues that Dr. Nisbet, Dr. McCaffree, and Nicole Craven, a human resources representative, did not speak with the parties involved. However, defendant's abuse of patients policy does not require that any particular person or persons investigate allegations and it does not state how the investigation must be conducted. [7] As the undisputed facts show some investigation occurred, plaintiff has not presented evidence that defendant acted contrary to Center Memorandum 11-5.

Plaintiff contends that defendant violated Center Memorandum 05-32, which requires defendant to provide employees with an opportunity to present their views before being disciplined and to follow the concept of progressive discipline. This policy is dated May 28, 1998 and states that it is automatically rescinded on May 28, 2002. On October 3, 2003, plaintiff signed a memorandum acknowledging that he understood that his conversion to part-time employment would affect his rights, specifically that:

> Appointments under 38 U.S.C. 7405 (a) (1) do not provide employees with job retention rights, grievance rights or appeal rights as it relates to separation. As a part-time employee you are employed at the will of the agency and your employment may be terminated from the Medical Center at any time without

---

[6]*Plaintiff's assertion that the testimony of the two employees was "completely inconsistent" is not accurate. Both employees stated that a patient approached plaintiff and requested a prescription refill. One employee said that plaintiff turned and walked off without speaking to the patient and the other said plaintiff told the patient, "No, I am not going to see you." This slight difference in accounts does not undercut the essential thrust of both accounts.*

[7]*The policy states only that the service chief will review complaints and/or evidence and make a prompt recommendation to the director whether a preliminary or formal investigation should be initiated.*

>   advance notice.

*See* defendant's motion, Exhibit 2. Plaintiff has not submitted any evidence showing that Center Memorandum 05-32 was applicable to him at the time of his termination in March of 2004.

>   **B.   Disparate Treatment**

Also, plaintiff argues that he was treated differently from similarly situated Caucasian, white, and/or American employees. Producing evidence of disparate treatment of similarly situated employees who violated work rules of comparable seriousness and are not of the protected class is an acceptable method of showing pretext. Green, 420 F.3d at 1194. "A similarly situated employee is one who 'deals with the same supervisor and is subject to the same standards governing performance evaluation and discipline.'" *Id.* (quoting Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220 (10th Cir. 2000)). "Work histories, company policies applicable to the plaintiff and the comparator, and other relevant employment circumstances should be considered when determining whether employees are similarly situated." *Id.*

>   **1.   Unscheduled Leave**

Plaintiff claims that non-protected employees were permitted to take unscheduled or unauthorized leave without being terminated. Plaintiff points to Dr. Masters' testimony that she had taken one emergency sick day after she had surgery. Dr. Masters was not a part-time employee and did not share the same immediate supervisor as plaintiff (she was a supervisor herself) and therefore is not similarly situated to plaintiff. Further, her use of leave was

apparently occasioned by her near collapse after return from surgery, rather than immediately following a dispute with a supervisor. There was also no suggestion that her use of leave not previously scheduled impacted any patient, as her testimony indicated that she found others to cover her patients for the day.

Plaintiff asserts that Dr. Sally Varghese took sick days without speaking with her supervisor. Plaintiff has offered no evidence that Dr. Varghese is of an unprotected class, was in plaintiff's unit, or was supervised by Dr. Masters. Further, the account provided by plaintiff does not show a violation of comparable seriousness as there were no allegations that Dr. Varghese ignored the needs or requests of her patients.

Plaintiff also relies on an internal memorandum that states that some physicians had taken leave without documentation. There is no evidence that the subject physicians were part of an unprotected class, were similarly situated to plaintiff, or that they disregarded the requests of their patients. Further, the memorandum does not state how defendant dealt with these physicians, so it is not clear that they were in fact treated differently than plaintiff.

### 2.  Work Rule Violations

Plaintiff contends that non-protected employees committed similar infractions but were not discharged. He points to a report of contact concerning a list of complaints a group of patients had some seven years before with respect to other doctors and staff and the hospital's programs in general. Plaintiff has presented no evidence as to whether the concerns were investigated and found to have merit, as occurred here, whether the doctors and staff were part of an unprotected class or whether the doctors were otherwise similarly

situated to plaintiff.[8]  Plaintiff's evidence as to this temporally remote incident does not suggest he was treated differently from others.

### 3. Rotating Offices

Plaintiff states that he was required to change his office every day while non-protected psychiatrist were not.  He has not identified the non-protected employees with whom he compares himself.  In the mental health clinic, Dr. Masters supervised four psychiatrists who were East Indian and two who were Bangladesh.  Only four of these psychiatrists, including plaintiff, were part-time.  Dr. Masters informed all of the part-time psychiatrists under her supervision that they would have to share offices because of the addition of two full-time psychiatrists.  Further, the undisputed evidence shows that Dr. Masters told plaintiff that, if he could work the hours that the clinic needed him, he could use the same office.  Plaintiff chose to work a different schedule.  Plaintiff has not presented evidence that he was in fact treated differently from any of the other part-time psychiatrists under Dr. Masters' supervision or that any of these psychiatrists were part of an unprotected class.

### 4. Workload

Plaintiff next claims that his workload was disproportionately greater than non-protected psychiatrists.  Defendant put forth evidence that, from April 1, 2003 to March 8, 2004, plaintiff saw fewer patients than any other part-time psychiatrist in his unit.  Defendant

---

[8]*Plaintiff's unsupported statement that Dr. Rosenberg and Dr. Jones were white and were not terminated is not evidence.  See Fed.R.Civ.P. 56.*

submitted evidence that plaintiff saw 682 patients, Dr. Benjamin saw 750 patients, Dr. Vad saw 844 patients, and Dr. Sebastian saw 961 patients. Plaintiff asserts that this is not an accurate account of his workload. He states that he did not start working in the mental health unit until April 7, 2003 and that he took three and a half weeks of approved vacation in August of 2003. However, even if plaintiff's slightly later start date and his vacation are accounted for, plaintiff still appears to have had the lowest weekly average number of patients seen of all the part-time physicians employed in his unit for the time period.[9] In any event, the specific evidence of workload does not suggest such unfair treatment as would support an inference of pretext as to the stated reason for his termination.

### 5.     Serving as Acting Chief

Plaintiff asserts that he was never given the opportunity to serve as acting chief of service and only non-protected persons who were less qualified were given this opportunity. Plaintiff does not dispute that Dr. Nisbet never asked any part-time physician to fill this position. He asserts that he was never asked to serve as acting chief when he was working full-time. However, plaintiff admits that he never asked Dr. Nisbet about serving as acting chief and that, while he believes others did not ask, he does not know if those selected had

---

[9]*Plaintiff saw 682 patients over approximately 45 and a half weeks for an average of approximately 14.99 patients per week.*
  *Dr. Benjamin saw 750 patients over approximately 49 and a half weeks for an average of approximately 15.15 patients per week.*
  *Dr. Vad saw 844 patients over approximately 49 and a half weeks for an average of approximately 17.05 patients per week.*
  *Dr. Sebastian saw 961 patients over approximately 49 and a half weeks for an average of approximately 19.41 patients per week.*

requested the position. Plaintiff has not presented evidence that he was in fact treated differently, hence no inference of pretext reasonably arises from these circumstances.

### 6. Statements by Non-Supervisory Employees

Plaintiff relies on statements made by Dr. Benjamin and Dr. Sebastian reflecting their personal beliefs that plaintiff may have been treated differently. Conclusory speculation is not sufficient to create a genuine issue as to pretext. *See* Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988) ("[P]laintiffs' mere conjecture that their employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment."). Moreover, nothing in either statement demonstrates that Dr. Benjamin or Dr. Sebastian believed that plaintiff may have been treated differently because of his race or national origin. In fact, Dr. Benjamin expressly stated that he did not think the difference was based on plaintiff's race or national origin.

Because plaintiff has not shown that there is a material issue of fact as to whether defendant's proffered reason was pretextual, the court will grant defendant summary judgment on plaintiff's discrimination claim.

## II. Retaliation

The plaintiff's retaliation claim is also analyzed under the McDonnell Douglas burden-shifting framework discussed above. Antonio, 458 F.3d at 1181. Plaintiff initially must show "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that

a causal connection existed between the protected activity and the materially adverse action." Argo, 452 F.3d at 1202.

Here, defendant asserts that plaintiff has not shown a causal nexus between his EEOC activity and his termination. In his response brief, plaintiff does not address defendant's arguments with respect to his retaliation claim. Defendant put forth evidence that plaintiff's EEOC activity consisted of a claim made by plaintiff and three other psychiatrists against another psychiatrist in 2001, which was dismissed, and a deposition plaintiff gave in another matter in 2003. Plaintiff was not discharged until March of 2004. Defendant also offered evidence that neither Dr. Masters nor Dr. Nisbet were aware of plaintiff's EEOC activity and that Dr. McCaffree did not consider plaintiff's activity when acting. Because plaintiff has not carried his burden of showing the third element of the prima facie case and, as discussed in part I above, has not made a showing that defendant's stated reason for his discharge was pretext, summary judgment as to plaintiff's retaliation claim is also appropriate.

**III.   Hostile Work Environment**

"To survive summary judgment [as to a hostile work environment claim], a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" and "must also produce evidence from which a rational jury could infer that [he] was targeted for harassment because of [his] gender, race, or national origin." Sandoval v. City of Boulder, 388 F.3d 1312, 1326-7 (10th Cir. 2004) (internal quotation and citation omitted). The harassment

must be both subjectively and objectively pervasive or severe. Witt v. Roadway Expressway, 136 F.3d 1424, 1432 (10th Cir. 1998). Whether an environment is hostile is determined "by looking at the totality of circumstances, such as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance;…whether it unreasonably interferes with an employee's work performance; and the context in which the conduct occurred." Smith v. Northwest Financial Acceptance, Inc., 129 F.3d 1408, 1413 (10th Cir. 1997). Any relevant factor may be considered but no single factor is determinative. *Id.*

The court concludes plaintiff has not presented sufficient evidence to create a triable issue as to his hostile work environment claim. Plaintiff states that he was "subjected to unfounded disciplinary actions, threats of termination, and other harassment for specious or false causes" and that he was required to work without breaks. Plaintiff has not directed the court to any evidentiary support for these allegations.[10] On summary judgment, the court does not consider such unsupported statements. *See* Fed.R.Civ.P. 56. Plaintiff again relies upon his disproportionately higher workload to establish that he was subjected to a hostile work environment. As discussed in part I above, plaintiff has not presented evidence that he was actually subjected to a greater workload. In any event, the evidence does not present a basis for inferring that any conflict with supervisors or in the workplace was due to plaintiff's

---

[10]*To the extent that plaintiff is referring to Dr. Masters' discussions with him regarding rotating offices, as discussed in part I above, all part-time psychiatrists in plaintiff's unit had to share offices and, further, he was told that he could use the same office each day if he could work the hours the clinic needed him. He chose to work different hours. Plaintiff has not presented any evidence that Dr. Masters' conduct was based on plaintiff's race or national origin.*

race or national origin. Therefore, summary judgment in defendant's favor will be entered as to plaintiff's hostile work environment claim.

Accordingly, defendant's motion for summary judgment [Doc. #45] is **GRANTED**.

**IT IS SO ORDERED**.

Dated this 22nd day of May, 2007.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE